## SCOTT *et al., vs.* WINSHIP *et al.*

When this Court is satisfied with the general result in an equity cause, but considers that the decree might be modified in a manner beneficial to all parties concerned, it will remand the case for this special purpose, without reopening the whole merits of the litigation.

In Equity, in Bibb Superior Court. Decided by Judge LAMAR, at May Term, 1859.

Isaac Winship individually, and the firm of Isaac Winship & Son, filed their bill against Eliza J. Scott and Wil-

liam B. Scott in Bibb Superior Court. The bill alleges, that at the November Term of Bibb Superior Court, Isaac Winship obtained a judgment against William B. Scott, then a resident of said county, for $661 87, besides interest and costs; that previous to that time, Scott had owned some $10,000 00 worth of property, but had sold most of it to his brother-in-law, and when said judgment was rendered, had in his possession a few negroes only, having by improvidence and dissipation squandered a good deal of his estate; that Isaac Winship & Son also held a note on him for $219 22, besides interest for goods furnished, and were creditors of Scott to that extent at that time; that about the time said judgment was rendered, Scott removed from Bibb to Cass county, and took with him said negroes received by him from his father's estate, taking them with the consent of his mother, Eliza J. Scott; that owing to the conduct of said William B. Scott, they became apprehensive of the loss of their debts—having learned, in the early part of 1855, that he had taken steps secretly and fraudulently to carry said negroes from Cass county into the State of Alabama for the purpose of defrauding his creditors; that whilst they were on the cars going to Alabama, two were levied on by virtue of the *fi. fa.* issued on said judgment, and the remaining seven were carried out of the limits of the State; that Eliza J. Scott interposed a claim to the two levied on, under an alleged bill of sale from said William B.; that in support of her claim she proved that she had conveyed her interest in her husband's estate to her four children—William B. being one—on condition that they would each secure her, by mortgage on unencumbered property, an annuity during life of $287 50—the conveyance to be void if the annuity was not paid; the bill alleges that all the children except William B. had executed mortgages according to agreement, but for some unknown cause, unless it was to aid him and preserve his credit, she took no mortgage from him, but in June, 1853, professed to buy said negroes from him for the alleged consideration of $3,000 00, when they were worth $6,000 00 or $7,000 00—said slaves then constituting his whole estate; that no one was present when said sale or contract was made except relatives of the parties, and the property was suffered to remain in possession of said William B., to use and control the same so long as he paid said annuity, and after

Scott *et al.*, *vs.* Winship *et al.*

Mrs. Scott's death, it was to be his property; that the only consideration of said sale or contract was the annuity aforesaid; that on the trial of said claim case, the jury found the property subject, and Mrs. Scott appealed to the Supreme Court, which granted her a new trial on such grounds as render it necessary for complainants to file a bill; that William B. Scott has a reversionary interest in said negroes at the death of his mother, which in equity should be subject to the payment of his debts—the hire being sufficient to pay said annuity; that said Scott was fast approaching insolvency at the time of said sale, and is now hopelessly so; that said negroes are now under Mrs. Scott's control, and are now worth $500 00 a year for hire and that most of them have been carried out of the jurisdiction of the Court.

The bill prays the resale of said negroes, and that after securing Mrs. Scott's annuity, a sufficient amount of the surplus be paid to complainants to satisfy their claims.

The answers of the defendants admit that Wm. B. Scott was improvident, and wasted a large part of his estate which at one time exceeded largely the amount stated by complainants; that there was no property in his possession in November, 1854, except said negroes, which did not belong to him; that Scott sold his plantation, stock, etc., to his brother-in-law, but not his entire estate—excepting said negroes as charged; that said Scott made a bill of sale of said negroes to Mrs. Scott, but the answers deny that there was any understanding that it was to be mere security, or that the property was to revert on Mrs. Scott's death—on the contrary, they say it was a fair and *bona fide* sale in payment of a just debt, and for a full consideration, the negroes being then worth about $3,000 00; they deny that Scott was insolvent when the bill of sale was made, and state that he had means, other than said negroes, amply sufficient to pay all his debts and leave several thousand dollars besides; Mrs. Scott states that she did permit her son to take the negroes to Cass county—he having removed to that county about June, 1853—being assured that her title was good, and being willing to aid her son, though she ran the risk of loss; she says she did not take a mortgage from her son, William B., as she did from the other children, because he had sold his real estate and had nothing but personalty, and he being improvident, she preferred to get the title to

the negroes; she says if her son ever designed to run off the negroes, it was not with her knowledge or consent; that she did so far yield to the persuasions of a friend as to start to remove said negroes to Texas, and had them brought to her at Montgomery for that purpose, but there changed her mind, and brought them back to Macon; her object in starting them to Texas was not to defraud any one but to carry them where they would be most profitable; she denies all fraud and combination.

William B. Scott states, in addition, that he removed to Cass county in June, 1853, and continued to reside there until after said judgment for $661 87 was obtained; he states that the judgment was obtained on a garnishment and for a debt which he was sued for in Cass county, and had to pay; that he supposed when he answered said garnishment he was fully protected in the matter, and was unapprised that a judgment had been entered against him until after he had paid the debt, (which was a note) in the hands of a transferree; he denies having anything to do with the removal of the negroes from Cass county, and denies all desire or design to defraud complainants or any one else; he says his mother permitted him to retain possession of said negroes, he agreeing to pay her hire at the rate of $287 50 per annum, but that he never paid her more than one year's hire.

On the trial of the case, complainants introduced the following proof:

They offered a *rule nisi* obtained at November Term, 1853, of Bibb Superior Court, reciting that William B. Scott had been served with garnishment returnable to that Term, and had failed to answer, and calling on him to show cause, by the next Term, why judgment should not go against him. Scott's answer, filed at May Term, 1854, was then read, which begins by stating the case as a garnishment returnable to the November Term, 1853, and *rule nisi* to May Term, 1854. The answer states, that at the time garnishment was served, he was, and "still is," indebted to William C. Jones $661 87 on a note dated February 1st, 1853, and due sixty days thereafter. Then follows a *rule absolute*, which was read in evidence, entering judgment in favor of Isaac Winship against said Scott as garnishee for the amount of said note, the judgment bearing date Novem-

ber Term, 1854, but entered *nunc pro tunc* as of May Term, 1854.

Complainants sustained by proof their allegations relative to Mrs. Scott's conveying her life interest in her husband's estate to her children, on condition that they would secure her, by mortgage, an annuity during life of $287 50 each, and showed that all the children except William B. Scott had executed mortgages to her.

James F. Barfield was then sworn and stated, that he knew all the negroes in 1849, except Zach and Effy. He goes on to give what he supposes they were worth in 1853, judging from their appearance in 1849. The aggregate of his estimates is, that the negroes he knew were worth from $2,600 00 to $3,300 00; his estimate for hire ranges from about $325 00 to $420 00.

Willis Wood testified as to the value of the negroes; says he knew them in 1852; their aggregate value then, as testified to by this witness, was $3,500 00; hire from $325 00 to $350 00 per annum. He further testified, that William B. Scott sold R. Freeman a plantation and some negroes in June, 1853; that said Scott retained possession of the negroes mentioned in the bill of sale to his mother after the same was made, and went to Cass county in the summer of 1853, carrying some mules and negroes; Mrs. Scott is about sixty years old; witness thinks Freeman gave Wm. B. Scott $13,000 00 for his plantation; the homestead was worth $5,000 00 or $6,000 00; Mrs. Scott is a stout, good-looking old lady.

R. A. Benson testified, that he is a son of Mrs. Scott, and knew of the arrangement between Mrs. Scott and her children, but does not think he was present when the bill of sale from William B. Scott to his mother was made; witness thinks said William B. was to retain possession of the negroes as long as he paid the annuity, but is not positive in his recollection on the subject. When he (witness) stated on a former trial that the negroes reverted on Mrs. Scott's death, he stated merely his own inferences—there was no agreement to that effect; the annuity to be paid by Mrs. Scott's other children was to cease at her death; thinks William B.'s liability for the annuity was the same as the liability of the others, but does not know whether this is derived from the parties or from inference.

Here complainants, after introducing their two *fi. fas.*, rested their case.

Defendants then read to the jury the original garnishment paper sued out by Isaac Winship in the case of William C. Jones, the garnishment affidavit bearing date April 28th, 1853, and having thereon the following entries of service:

"Executed the within by serving John J. Carey, as one of the firm of Hall & Carey, personally, with a summons of garnishment, and have advertised my proceeding according to law—29th day of April, 1853.
(Signed)                    "D. I. DAVIS, Sheriff."

"Served John J. Rawls personally with a summons of garnishment—Oct. 1st, 1853.
(Signed)                    "T. BAGBY, D. Sheriff."

"Served William B. Scott, as a garnishee, personally with a summons of garnishment on the within stated case—30th April, 1854.        (Signed)
"THOS. BAGBY, D. Sheriff."

Defendants also put in evidence a bill of sale from William B. to Eliza J. Scott, dated June 22d, 1853, conveying, in consideration of $3,000 00, the negroes in dispute to the said Eliza J. with warranty of title.    There was no witness to the paper.

Here defendants rested their case, and complainants, in rebuttal, read the evidence of R. F. Maddox, who stated that, as Sheriff of Troup county, he levied a *fi. fa.* in favor of Winship against Wm. B. Scott, in February, 1855, on two of the negroes in dispute; found the negroes levied on with several others, on the cars of the Atlanta & LaGrange Railroad, going towards Texas; the young man who had charge of the negroes, stated that William B. Scott had hired him to take the negroes to Montgomery or New Orleans; thinks he also stated that he expected to meet Mrs. Scott in New Orleans.

Complainants also read the evidence of Mrs. Eliza J. Scott, taken by commission. She testified, that when the negroes were levied on by the Sheriff of Troup county, they were in charge of one Aycock, who had been employed by

C. A. Hamilton to bring them to her; William B. Scott was not carrying them to Texas; William B. Scott did not pay the taxes on the negroes in Cass county; does not know whether he did before carrying them there or not; witness never paid taxes on them; the negroes were in William B. Scott's possession and under his control all the time they were in Cass county, but not afterwards. Witness did divide her negroes some time ago among her children, and held them under obligations to pay her a stated amount per annum, to-wit: $287 50; she was satisfied to let William B. Scott keep the negroes by his paying that sum; the negroes which fell to said William B., on the division of witness' property, are the negroes in dispute.

Complainants then read to the jury a certificate from the Clerk of Cass Inferior Court, showing that William B. Scott gave in taxes in 1854 on the following property, as his own, to-wit: 9 slaves, valued at $4,050 00; money and solvent debts, $4,000 00; other property, (plantation tools excepted,) $1,000 00.

The testimony here closed, and the jury returned the following verdict:

" We, the jury, find and decree in favor of complainants, to-wit: Isaac Winship and Isaac Winship & Son, that their judgments are valid and binding for the amount of each, principal, interest and cost. We further find and decree, that the nine negro slaves in the bill of complainants mentioned, (naming them) shall within forty days from this date be surrendered and turned over by said Eliza J. Scott to a Receiver, to be appointed by this honorable Court during the present term, and after the usual advertisement, said slaves to be sold at public outcry, and a sufficient amount raised, set apart and invested securely, to pay said Eliza J. Scott the sum of $287 50 annually during her natural life, and after said sum is thus set apart, the balance of proceeds of sale shall be applied to the payment of the judgments of complainants. We further find and decree, that upon the termination of the life of said Eliza J. Scott, the said sum so set apart and funded to pay said annuity, shall be paid by said Receiver into the hands of the Clerk of this honorable Court, subject to be applied to judgments against said William B. Scott, if any there be, or to his order, if there be no liens upon said fund. We further find and decree the

costs of this proceeding against the defendants. May 17th, 1859."

Defendants moved for a new trial on the following grounds:

1st. Because the verdict is contrary to law and the evidence.

2d. Because said verdict is against the charge of the Court in this: The Court charged—"if the jury believe that William B. Scott was served with a garnishment on the 30th of April, 1854, and there was no service on him while residing in Bibb county, and that said Scott was at that time a resident of Cass county, then the judgment entered for $661 00 against said Scott on said garnishment is not valid against Mrs. Scott, and complainants cannot obtain a decree for the payment of said judgment." And further the Court charged—" that the recital in the answer of William B. Scott to the garnishment, that the garnishment was returnable to November Term, 1853, does not prevent Mrs. Scott from showing by the return of the sheriff, that the garnishment was not served until the 30th of April, 1854, and if the jury believe it was not served till April, 1854, and that Scott was then a resident of Cass county, the judgment thereon is not valid against Mrs. Scott." The Court also charged on this point, "that the return of the sheriff was to be taken as true, unless the jury believed from the evidence that the sheriff's return was incorrectly dated by mistake, or from some other cause, but was not conclusive, nor did it preclude complainants from showing service on Scott."

3d. Because the Court erred in charging the jury, that if they believed there was no fraud in the transaction between William B. Scott and his mother, still, if they believed from the evidence that the bill of sale was given by said Scott to his mother to secure an annuity which he was bound to pay her during her life, and although absolute on its face, it was designed by the parties to be a mere security; and if they further believe that the negroes were, at the time of said bill of sale, worth more than Mrs. Scott's annuity for life, then they were authorized to regard the bill of sale as a mortgage, and to decree that the negroes embraced in said bill of sale should be resold, and after securely investing or otherwise disposing of a sufficient amount of the proceeds of the sale to secure the payment of Mrs. Scott's said annuity promptly during her life, the

jury were authorized to decree that the balance, if any, arising from the sale, should be applied to the payment of any just debt complainants might hold against William B. Scott.

4th. Because the Court erred in admitting the evidence of the sheriff of Troup county, as to what the man who had charge of the negroes levied on said, at the time of the levy, about William B. Scott having employed him to take said negroes to Texas.

5th. Because the verdict is erroneous in this, that it attempted to change the contract between Mrs. Scott and her son, and to substitute a new and different contract in its stead.

There were other grounds taken in the motion, but they were not relied on, and it is unnecessary to state them.

The Court refused a new trial, and counsel for defendants excepted.

LANIER & ANDERSON, and B. HILL, for plaintiffs in error.

SPEER & HUNTER, and L. N. WHITTLE, *contra.*

*By the Court.*—LUMPKIN, J., delivering the opinion.

After carefully examining the errors complained of in this case, we are of the opinion that the decree ought to stand. It occurs to us, however, that a slight modification of the decree might be made with benefit to all parties, and that is, to ascertain by the examination of experts the present value *in gross* of the annuity coming to Mrs. Eliza Scott, by referring the matter to a special jury; provided, counsel could not agree on the amount—and to decree, that out of the proceeds of the sale of the property, this sum be paid over to Mrs. Scott; that of the balance, if there be enough for that purpose, that Cunningham's claim be paid, and the surplus, if any, be paid over to William Scott, if there be no other liens upon the fund, and we shall send the case back, merely to have the decree remodeled in conformity with these views.